GERMANIA FIRE INS. CO., APPELLANT, VS. PHINEAS STONE, APPELLEE.

1. Under the statute permitting a party to a civil action to testify in his own behalf, it is competent for him, where the question is whether or not he did a certain act with a fraudulent intent, to testify as to his intention, and to state whether or not he, at the time of acting, considered that he had the right to do the act. Such testimony, however, is not conclusive upon the jury.

2. Where the question of fraudulent intent is one of fact, it is peculiarly the province of a jury to decide it; and a verdict will be disturbed, by an appellate court, as contrary to the evidence, with great hesitation, after a motion for a new trial has been overruled at *nisi prius*, there being testimony to sustain the verdict.

3. A paper neither written nor signed by the party against whom it is sought to be used in evidence, and whose contents have not been acknowledged by him to be a correct statement of what it purports to set forth, is not admissible as *per se* evidence of its contents as against such party.

Appeal from the Circuit Court for Escambia County.

This is an action brought by the appellee to recover upon a policy of insurance. The declaration alleges *inter alia* that the appellant, one of the two underwriters, by its policy which is made a part of the declaration, agreed to make good to appellee all such immediate loss or damage, not exceeding the sum of $1,500, (one-half of $3,000,) as should happen by fire to his stock of dry goods, ($1,300,) and his store furniture, ($450,) from April 7, 1883, noon, to April 7, 1884, noon, the amount of such loss or damage to be estimated according to the actual cash value at the time of the loss. The fire is alleged to have occurred on April 7, 1884, and to have consumed before noon the stock and furniture, the actual value of the goods being put at $9,878.82.

It alleges having given notice of the loss, and proofs of loss, and having done and performed all the conditions precedent required by the policy.

The company filed pleas as follows:

1st. Never indebted.

2. That before suit and prior to the completion by the plaintiff of the proofs of loss alleged in the declaration, it demanded of the plaintiff that he submit to an examination under oath, apart from all other persons, except the attesting magistrate or notary, by one J. S. Rains and Thomas Eggleston, appointed by the company for said purpose, and prescribe such examination when reduced to writing, in accordance with the terms of policy, but plaintiff refused to comply with the demand, and has ever since so refused, and has never submitted himself to such examination.

3d. That on March 27, 1884, the plaintiff did make a false representation, under his oath, to George Reese, Assessor of Taxes for said State of Florida, and County of Escambia, touching the value of the property insured with intent to defraud the revenue of said State and county, he

JUNE TERM, 1885. 557

Germania Fire Insurance Co. v. Phineas Stone—Statement of Case.

declaring under oath duly administered by Reese that the true cash value of his merchant's stock, which stock was at that time insured by said policy, was on March 1, 1884, $1,400, when in truth and in fact it was several thousand dollars over and above $1,400, "and that said $1,400, with $400, which under said oath he declared to be the true cash value at said date of his gold and silver watches, clocks, silver plate, pianos, sewing machines, organs, books and household and kitchen furniture, was the cash value of the personal property of any kind, which he, plaintiff, owned on said first day of March, 1884, when in truth and in fact, plaintiff then and there owned other personal property, to-wit: his store furniture, fixtures, useful and ornamental, insured by said policy, none of which above named property was or is exempted from taxation by any statute of Florida."

4th. That in the policy it is provided that in case of loss, the assured shall, if required to, submit to an examination under oath, apart from all other persons except the attesting magistrate or notary, by any persons appointed by the companies, and if deemed necessary by the companies, to a second examination and subscribe to such examination when reduced to writing. Plaintiff did submit to an examination as required, but declined to and would not subscribe and swear to the same after it was reduced to writing as provided, although he had promised to so submit and subscribe to the same, and was thereto duly requested.

As to the first plea the plaintiff joined issue.

As to the second plea, plaintiff, for a replication, says it is not true that he positively refused to comply with the demand of the defendant; and for a *further replication*, he says it is not true that he has ever since the time stated refused to comply with the said demand, but that on the

contrary, before the suit was brought, he announced to the said agents of the company his readiness to comply with said demand, and on or about the —— day of April, 1884, the attorney of the plaintiff, W. A. Blount, announced to the defendant's agent, Thomas Eggleston, that the plaintiff was ready to take the oath and submit to the examination, and subscribe the same as required by the policy,

As to the third plea the plaintiff took issue.

As to the 4th plea the plaintiff says it is not true, and for a *further replication* to said plea the plaintiff says that subsequent to the time when defendant alleges that plaintiff refused to comply with the provisions of the policy set forth in said plea he announced to the agents of defendant his readiness to comply with said provisions, and that subsequent to said time, to wit, on or about the —— day of April, A. D. 1884, the attorney of the plaintiff, W. A. Blount, announced to Thomas Eggleston, agent of the defendant, that the plaintiff was ready to comply with said provision, and plaintiff has always been ready to comply.

The defendant joined issue on plaintiff's replications.

The testimony set out in the bill of exceptions is substantially as follows:

Phineas Stone, the plaintiff, produced the policy of insurance, and testifies that he paid the premium; also that on April 7, 1884, between 6 and 7 o'clock A. M., a fire occurred by which his store and all its contents were destroyed. Had other commercial insurance on his stock to the amount of $8,000. That his stock at the time of the fire, as he estimated it under the advice and suggestion of Mr. Knowles, agent of the Underwriters, was $9,878.82. It was greater in March, April and October than at any other period. He took the last inventory himself with the assistance of clerks, and estimated goods at what they would be worth in New York market; it was taken August 1, 1883,

and showed a value of $7,223.68. On April 6, 1884, he had on hand in store goods to the amount of $11,726.78 by his method of calculation, but by advice of Mr. Knowles, who showed witness errors in his calculation, he made up the proofs for a less sum, viz: $9,878.82, which amount he certainly had on hand.

That some days after the fire Rains and Eggleston, agents for the Underwriters, came, and they proposed and witness answered a number of questions relative to fire and the stock. One of them was writing while witness talked to the other. He was then requested to sign it, but declined to sign it at that time, stating that he wanted a copy of it; that they had taken down figures from his books and he wished to verify them. They refused to give a copy. but told him to meet them next day at ten o'clock. Met them next day at Knowles' office, and they again asked him to sign it. He said he was not satisfied with it, and wanted a copy. Witness had not read the policy, and said to Rains: "What do you want me to sign this? for what is all this about?" He replied that it was none of my damned business. John M. Pfeiffer and Henry White were present at the time. After such treatment witness was unwilling to have anything further to do with Rains, and never did sign the statement. It was never presented to witness afterward. No payment has been made on the loss. Made up and delivered to Knowles, agent of the Underwriters, proof of loss in latter part of April, 1884.

Upon cross examination, Stone testified that in, March, 1884, he made a statement in writing to George Reese, Tax Assessor of Escambia county, Fla., setting forth the value of his personal property. Signed it but does not know whether he swore to it or not. The statement or tax return was introduced in evidence. It bears date March 27, 1884. The only heads of the return filled out are as follows:

"Gold and silver watches, clocks, silver plate, pianos, sewing machines, organs, books, and household and kitchen furniture, value $400."

"Merchant's stock, value $1,400."

The affidavit to this return is as follows:

"STATE OF FLORIDA, }
"County of——, }

" I, P. Stone, solemnly swear that the foregoing is a full and correct list of all the personal property of any kind which I owned on the first day of March, 1884, or which I had under my charge or management at that time and not expressly exempted, and that the valuations given above are the true cash value of the property listed. So help me God.                                        PHINEAS STONE."

"Sworn to and subscribed before me this 27th day of March, 1884.                                        GEORGE REESE."

He testifies that he did not know what was the oath or statement; did not intend to defraud the State. Considered that the value of his merchant's stock then returned, viz: $1,400, was a true and correct statement of its value. Does not give in his stock to the Tax Assessor at its actual value, but at what he thinks it worth to him. Considered that he had the right to deduct therefrom his indebtedness. [Defendant's attorney here objected to the admissibility of this testimony on the ground that plaintiff's opinion in the matter had nothing to do with the case. The objection was overruled, and there was an exception.] His indebtedness at the time of the statement amounted to $6,300, $3,500 on goods bought, and $2,800 for money borrowed wherewith to buy goods. The statement then made, March 27, has reference to his stock as it was on March 1st. On March 1st, his stock in store was of the value of about $8,000.  " I deducted my said indebtedness of —— therefrom."  Was not able to say exactly what was the value of

his stock March 1, 1884, as he had taken no inventory since August. "Refused to sign statement written by Reese, because he wished me to sign and swear to it without my knowing what it contained. He read it over to me at the hotel, but I did not know whether he was reading it right or not, and he would not give me a copy and let me verify it."

Henry White, for plaintiff, testified : That he heard conversation at Knowles' office between Stone and Rains as to the insurance; heard Stone say : "What is all this for anyway?" and Mr. Rains answered, "it is none of your business." Pfeiffer said Stone stated he wanted to know all about it before he would sign.

### TESTIMONY FOR DEFENDANT.

George Reese was Tax Assessor, &c., in March, 1884. Stone, in witness' presence, on March 27, 1884, signed and swore to the return. It was returned by Stone to witness. Proves signatures of himself and Stone. "I read over only a part of the oath taken, that part which states that the foregoing is a full and correct list of all his personal property on March 1st, not exempt, &c."

Thomas Eggleston is an insurance adjuster, was in Pensacola April, 1884, with Rains for purpose of adjusting losses by fire for the underwriters ; Stone's, one of the losses. We had Stone at our room at the Continental Hotel, and subjected him to an examination, we three being the only ones present, as to the fire and his stock, which examination was reduced to writing at the time in his, Stone's, presence. Hereupon the defendant produced and offered in evidence the said examination reduced to writing, and its introduction was objected to because it was not competent evidence in the cause, and the objection was sustained, and defendant excepted. Eggleston resuming his testimony,

said : " Mr. Stone refused to sign it at that time, claiming that he wanted time to look into it." On the following day he says they again met at Knowles' office, and Stone again refused to sign the statement. States positively that he did not hear Rains tell Stone that it was none of his d—d business or use any language to that effect. They had some words, growing out of Stone's refusal to sign, but he heard nothing of that kind. He never was notified by any one thereafter of Stone's readiness to submit to an examination under oath at defendant's instance apart from all other persons except the notary and attesting magistrate.

The policy provides that "if the assured, prior to or during the term of this policy, shall have made or shall make any fraudulent or false representations to the authorities, touching the property hereby insured or property contained therein with intent to defraud the public revenue,   *   * the policy shall be void."

It also provides as follows: " And the assured shall, if required, submit to an examination under oath, apart from all other persons except the attesting magistrate or notary, by any person appointed by the companies, and if deemed necessary by the companies to a second examination, and subscribe to such examination when reduced to writing." *   *   " And until such proofs, declarations and certificates are produced, and *examinations* and appraisals permitted, the loss shall not be payable. All fraud or attempt at fraud, and false swearing, on the part of the assured, shall cause a forfeiture of all claim under this policy."

The Circuit Judge charged the jury, that if they believed that the plaintiff had complied with all the obligations imposed on him by the contract, then they were to consider the amount to which he was entitled, including interest. That the clause as to defrauding the public revenue was an express condition that must be complied with, and if they

believed from the evidence that the plaintiff had made a false representation touching his merchant's stock to the Tax Assessor with intent to defraud the public revenue, they must find for the defendant. That if they believed the plaintiff had refused, when reasonably required by defendant, to submit to an examination under oath, &c., or when so requested had refused to sign or swear to such examination when reduced to writing, they should find for defendant. That the plaintiff had a right to a reasonable opportunity to verify the statement and figures which had been taken down by the agents as part of his statement, and if such reasonable opportunity was not given by the agents of the defendant, the plaintiff had not violated his contract by refusing to sign such unverified statement.

That if the jury believed from the evidence that plaintiff, prior to or during the policy, made a false representation touching the value of the property with intent to defraud the public revenue, then such false representation, whether it amounts to perjury or not, renders the policy void and plaintiff cannot recover. That the fact that plaintiff in making his statement of the value of the property on March 1, 1884, chose to deduct the amount of his debts therefrom, is in law no excuse or extenuation for or of such false statement.

There was a verdict in favor of plaintiff for $1,411.55.

There was a motion for a new trial on the ground that the verdict was contrary to the evidence, the law, the instructions of the court, and because the Judge erred in permitting plaintiff to give in evidence his understanding as to the law of Florida relating to his tax return, and in refusing to admit in evidence the unsigned answers of the plaintiff to questions of defendant's agent.

A new trial was refused, and there was final judgment for the plaintiff. Defendant appealed.

*S. R. Mallory* for Appellant.

*W. A. Blount* for Appellee.

Mr. Justice Raney delivered the opinion of the court:

The first error assigned is the action of the Judge of the Circuit Court in permitting the plaintiff " to give his opinion as to his right to deduct the amount of his indebtedness from the return of his personal property handed in by him to the Assessor of Escambia county.." The plaintiff testifying in his own behalf had stated on the cross-examination that he did not intend to defraud the State; that he considered the value of his merchant's stock there returned, viz: $1,400, was a true and correct statement of its value, and continuing, he says: " I do not give in my stock to the Tax Assessor at its actual value, but what I think it worth to me. I considered that I had the right to deduct therefrom my indebtedness." Here the counsel conducting such cross-examination for the insurance company objected " because plaintiff's opinion in the matter had nothing to do with this case." The objection was overruled and there was an exception. The plaintiff then stated his indebtedness, at the time of the statement, amounted to $3,500 on his stock, and $2,800 borrowed wherewith to buy goods, thus aggregating $6,300. That on March 1st, 1884, the time to which the statement had reference, it was in value about $8,000; was not able to say exactly what its value was as he had taken no inventory at that time. The question for the jury to decide was whether the plaintiff had made a false representation touching the value of the property with an intent to defraud the public revenue. If the plaintiff honestly believed that he had the right to make

such a deduction and he acted, in making it, on such belief, then he did not have an intent to defraud the revenue.

The intent to defraud is essential to the plea, and must be proved. It was, in our opinion, the right of the plaintiff to explain the discrepancy between the valuation in the tax returns, and that in the policy, and to show the absence of the alleged intent to defraud, and to this end to state whether he considered that he had the right to deduct his indebtedness from the real value. What he may say is of course not controlling with the jury. They would decide whether they believe him or not, and circumstances developed by the testimony in the case may lead to a conclusion entirely different from the absence of fraudulent intent claimed by him.

In New York, where we get our statute permitting parties to testify, it is held that " a party, when charged with an intent to deceive, or cheat, or defraud, or with fraud and deceit, has a right to testify as a witness in his own behalf that he did not intend to cheat, deceive or defraud, or to practice any fraud or deceit in the transaction wherein he is charged with having had such motive, leaving the weight due to his evidence to be·determined by the jury." Pope vs. Hart, 35 Bar., 630; Matthews vs. Poultney, 33 Bar., 127 ; Seymour vs. Wilson, 14 N. Y., 567 ; Griffin vs. Marguardt, 21 N. Y., 121 ; Forbes vs. Waller, 25 N. Y., 430; Bidwell vs. Chase, 34 N. Y., 386 ; Thurston vs. Cornell, 38 N. Y., 281; Thorn vs. Helner, 41 N. Y., 26, (Keys); Hubbell vs. Alden, 4 Lansing, 214. In Thurston vs. Cornell, it is laid down that " under the law admitting parties to testify in their own behalf it is well settled that where the character of the transaction depends upon the interest of the party, it is competent when that party is a witness to inquire of him what his intention was."

2d. The second assignment of error is upon the Circuit

Judge refusing to admit the appellant "to read in evidence the statement made by appellee and taken down in the presence of the Rains and Eggleston adjusters." The attorney for appellant argues that the "appellee's reason for not signing that statement may be an excuse for not complying in that respect with the terms of the policy, but it is no reason why the admissions therein made against his interest should not have been submitted to the jury."

The plaintiff testifies that he asked, when requested to sign this paper, for a copy of it, that they had taken down figures from his books and he wanted to verify them. That they refused to give him a copy. They told him to meet them again next day at ten o'clock. He met them, and they again asked him to sign it, when he said he was not satisfied with it, and wanted a copy, and that he was unwilling to sign and swear to it without knowing what it contained, he not knowing whether Rains had read it rightly. He says he had not read the policy and said to Rains, "what do you want me to sign this for, what is it all about," and Rains replied that it was none of plaintiff's business. White testifies he heard plaintiff ask "what is all this for anyway," and Mr. Rains answered, "it is none of your business." Rains is not introduced as a witness. Eggleston says Stone refused on the first day to sign, claiming that he wanted time to look into it, and that he refused on the second day to sign it, and although he states "positively" that he did not hear Rains make the reply attributed to him, he does not deny Stone's having requested a copy of the statement, nor the refusal to give it, nor the above questions of Stone.

It is not claimed that the paper sought to be introduced is admissible as an examination taken under the policy. Even if the plaintiff knew of the provision in the policy it is not apparent that when the conversation took place at

the Continental Hotel, on April 7th, with one of the adjusters, and the other wrote down what the plaintiff said, that the plaintiff was aware that an examination *under the policy* was being made. Moreover there does not appear to have been any magistrate or notary present at the examination to administer an oath, or suggest the real character or purpose of the proceeding. The provisions of the policy contemplate the presence of a magistrate or notary, and also that of the assured, and the representative of the insurer. The magistrate or notary is presumed to be impartial, but two representatives of the insurer, in the absence of such officer, are hardly to be so considered, particularly in the light of the record before us. To permit the paper to be read in evidence under the policy would be to ignore the plain provisions of the clause providing for the examination, and would be placing the assured at a disadvantage not contemplated by his contract. We do not see under what principle of law it can be admitted as of itself evidence against the plaintiff. It is not his writing; he has not signed it, nor has he acknowledged its contents to be true. It cannot be treated as itself evidence of admissions made by him. It is the creature of Rains, and not of the plaintiff. It has not been attempted to use it to refresh the memory of Eggleston, and, therefore, it is not necessary to discuss it in this light.

3d. The third error alleged is the refusal of a new trial moved for on the grounds disposed of above, and on the further grounds that the verdict was contrary to the evidence, the law and the instructions of the Judge. It is contended that there was no evidence whatever in the case to qualify the legal presumption that the appellee, in making the false statement of his personal property, and its value to the assessor, intended to do that which was the natural consequence of his act, *i. e.*, defraud the State of

Florida and the County of Escambia; his statement that he did not intend to do so, being under the circumstances not sufficient to negative the presumption arising from his act, an act which he did deliberately, which the law requires every citizen to perform, and of whose purpose and object no one can plead ignorance.

The intent of the plaintiff in making the return was a question of fact for the jury to pass upon, and not one of law. In deciding this question of fact, it was the duty of the jury to consider all the testimony including the plaintiff's statement as to what he did, and that he considered he had the right to do it. Such questions of fraudulent intent are peculiarly within the province of a jury to decide. For this court to say that there was no evidence in the case to qualify the legal presumption arising from the false statement in the return would be to ignore the plaintiff's testimony. If the jury believed his statement that he did not intend to defraud the State, and that he considered he had a right to deduct the amount of his indebtedness, they could not have found a verdict against him. They must have believed it, and consequently they found as a fact that he did not intend a fraud. We cannot reverse the verdict without usurping their functions and inferring as a legal conclusion from the fact that he made a false affidavit, that he intended fraud.

The fact that we are not willing to admit that we should have come to the same conclusion as the jury have, had it been our province to pass originally upon the question of intent, does not change the law as to our duty in reviewing the questions on appeal. Considering the whole testimony, we think the verdict is sustained by the evidence, in view of the established hesitation with which appellate courts interfere with verdicts in such cases. Wakeman vs. Dalley, 44 Bar., 498; Weed vs. Case, 56 Bar., 534, 549; Mat-

thews vs. Poultney, 33 Bar., 127; Oliver vs. Chapman, 15 Texas, 400; Briscoe vs. Bronaugh, 1 Texas, 326; Carter vs. Carter, 5 Texas, 93; Louchein vs. Henezey, 77 Penn. St., 305; Sherwood vs. Marwick, 5 Me., 295; Winter vs. Norton, 1 Oregon, 43; Keller vs. Niagara Co., 16 Wis., 569, 568; Williams vs. Hartshorne, 30 Ala., 212; Hilliard on New Trials, 349, 352, note A; Marsh vs. Falker, 40 N. Y., (1st Hand,) 562; Starr vs. Peck, 1 Hill, 270.

This is not a case in which the intention is to be judged of by a written instrument alone.

We do not think the Circuit Judge intended to take from the jury a consideration of the plaintiff's statement as to his interest, or that the verdict can be reversed as contrary to the charge of the court.

The judgment is affirmed.